John Demarais, President of Lucent Technologies President Marias, am I saying that correctly? Demarais, yes. Demarais, thank you. May it please the Court, John Demarais for Lucent Technologies. The District Court's award of fees in this case based on Lucent's allegations against Dolby Cinema products was a clear error. This is most easily seen if we look at what happened prior to that award. The District Court itself had granted a motion to compel discovery on the very same cinema products. In granting the motion to compel discovery on those cinema products, the District Court concluded that AC-3, which is what the technology is called by Dolby, was used both in Dolby's consumer products and in the cinema products. And those documents were before the District Court showing Dolby making those statements. Now, in a clearly erroneous reversal of position, the same District Court finds allegations against the cinema products to be a Rule 11 violation or, in the words of the statute, objectively baseless. Dolby's public literature was clear, both technical literature and marketing literature, that the cinema products and the consumer products practiced what they called the AC-3 standard. And those documents are in the appendix. A perfect example is you have A-5093. Another good example is A-320. You get your depositions in August of 2004, right? Oh, there was the one key deposition to Mr. Vernon was in August 2004. We were then—Mr. Vernon, I referred to answers that couldn't be answered by him, and he referred us to Mr. Davis. And we tried to get a deposition of Mr. Davis, and we had trouble with Dolby getting an agreeable time to depose Mr. Davis. So we actually had to move to compel the deposition of Mr. Davis. That was following the August timeframe. So we ultimately didn't get a ruling on the motion and compel until much later. So finally, the timeframe I think Your Honor is looking at is when Discovery was finished in the sense that we were told— December of 2000. It was roughly a month, a little over a month before the summary judgment was filed. So it was about a month up until that. The cases dropped when? So Dolby files its summary judgment motion was about a month later, a little over a month later. And we don't—we call them and we ask to stipulate to dismissal. We agreed with their summary judgment position. So we never even filed an opposition to the summary judgment. We essentially agreed to drop it in the face of the summary judgment motion. The summary judgment motion is specific. When is the summary judgment motion filed? It was—I don't remember exactly. It was either January or February of the following year. So then we dropped it within the response time. I think in either February or March of that year we dropped it by stipulation or by agreement. And we agreed to drop it with prejudice. I thought it was dropped in September. Could you check the facts on that? Maybe I have the wrong facts on when it was. September of? 2005. Yes, I'll check the record on that, Your Honor. I thought it was the email and the record. I thought— It seemed to me like that would be a long gap after once receiving information that— If I could just get the attendance, I think I can get it. Yeah, check the records. It's worth doing that. Because it seems that— Yeah, I think I— That's some kind of information that shows you there's no infringement. If we look at—yes, Your Honor. If we look at A4741. A4741. Okay. We can see— Yeah, sure. Okay. Yes, you'll see an email from Mr. Leibniz at Dolby, Dolby's Outside Council, to Alan. That's Alan Kelman from Lucent's Outside Council. It's dated February 14, 2005. And it says, This confirms our agreement today that Lucent will dismiss its claims with prejudice regarding Dolby's cinema technology. So that was in February. I don't remember exactly when the summary judgment motion was filed, but I think it was in that December, January timeframe. And it was before our time to respond that we—to oppose that we dropped. So the delay, from our point of view, was at most just over a month before we dropped it because the district court didn't deny our discovery of our deposition to Davis until just over a month before the summary judgment was due. And in the face of the summary judgment, we dropped the allegations. So it was not a long delay. Certainly, we had Vernon's deposition in mind, but Vernon referred to things that Davis was going to say. Was there any sense in which, once you've received those depositions, you should have dismissed immediately instead of putting them to the expense of filing a summary judgment and kind of calling your bluff? And then you finally say, OK, you got us. We'll back off. Well, certainly, that's Dolby's allegation that we should have dropped it. That seems to be what the district court's finding, too, although— I don't think, actually, when you look at the district court's reasons for giving us the—or for ruling against us on fees, the district court actually relied on something that was clearly around us. The district court, when you read the opinion, relied on the fact that we didn't have CINEMA claim charts as characterized by the district court. But that's clearly around us because in the way that Dolby described its CINEMA technology in its technical documents and on its website and in all its public literature was it described CINEMA and consumer products as AC-3. We had pages and pages of AC-3 claim charts. AC-3 is the Dolby standard for this technology. The district court itself. Aren't there different algorithms that are referred to generally as AC-3? There's a different algorithm for the consumer and the CINEMA product? Your Honor, put your finger on exactly the issue in why a leason is being held to a standard that no patentee could follow, which is pre-discovery, the only thing that's publicly available is that Dolby Digital is AC-3. And we've cited all the documents in there and I can give you the sites. They say CINEMA is AC-3. They say consumer products are AC-3. And AC-3 is the standard. It is not publicly known, pre-discovery, that there are then subsidiary algorithms for consumer products and CINEMA. When we get into discovery... You did learn that along the way. So if you look at what happened in the case, actually, Dolby refused to provide discovery at all for CINEMA early on. We had to move to compel several times to get any discovery on CINEMA. Ultimately, the district court agreed with us that CINEMA was relevant and discovery would take place because of Dolby statements on the website. And then in response to that, they do produce Mr. Vernon, and we finally get discovery. But now we're already in August of 2004, I think the time period is, where we finally take Mr. Vernon's deposition. Prior to that, we didn't have the details of the algorithm. We didn't have a witness who explained the details of the algorithm. Well, Mr. Vernon did provide a declaration in March of 2004. Right, but if you look at... But not the fact that there were different algorithms. That's exactly right, Your Honor. But if you look at the history of what happened, Dolby refused to provide any discovery in the context of the motion to compel and their motion for... We moved to compel, they moved for protective order. They submit only Vernon's declaration, where Vernon makes the statement of fact that there are different algorithms. There's been no computer source code produced, no documents produced, no memos produced of any kind that said, well, the only thing in the record is Vernon's declaration. Vernon's declaration was inconsistent with Dolby's admissions in the documents that we have. And in fact, we used that in our motion to compel the district court. We showed the district court that Vernon's declaration was inconsistent with Dolby's own documents. And the district court cited the inconsistency in Vernon's declaration when the district court agreed that we could get discovery. I can show you that in the appendix. That's at... Here at A3142, the district court says at line 11... 3142. At line 11, it says, a review of all the materials submitted in conjunction with this motion, especially the Vernon declaration, and the 610 patent and the 962 patent, lends credence to Lewson's argument that the claims and defenses presented in this action do not differentiate between EC9 and EC10 algorithms. So the district court actually sided with us and said Vernon's declaration is inconsistent and it's unclear whether there's a distinction. And that's when the district court finally granted us discovery on the cinema in order for Dolby to produce the underlying algorithms. And then once we got the algorithms, we then took Vernon's deposition. And during the Vernon deposition, he said some things we had to go to Davis for. Did you ever produce a claim chart? Well, here's the error... That's what the district court focuses in on. Is that somewhat consistent with our case law, where we say the same thing? Absolutely, and we don't take issue with that. We produced hundreds of claim charts. I think the record shows there were 400 claim charts. Every single one of the claim charts is the same because it's... I don't mean it's the same. What I mean is it's against the same thing, which is called the EC3 standard. There are obviously differences in the different claim charts. But when we file those with the district court as the infringement pretensions, they say for all products using EC3, they specifically call out cinema and consumer products. And the issue is, the issue that the district court said is, do you have one entitled specifically cinema? And we said, no, Your Honor, we're not proceeding on the case that way. This is a case against EC3 implementations of the standard. And when you look on Dolby's technical documents, which were available, they said cinema does EC3, and consumer products do EC3. I mean, there's no... Just to give you one example that jumps out, this is from Dolby's technical document entitled Dolby Digital, The Sound of the Future. It's here today. It's at A5093. They say, all variations, however, are based on the same advanced perceptual coding technique, Dolby EC3, which ensures both compatibility among formats and adaptability of future needs. And they're referring to DVDs, consumer products, and cinema. They say it time and time again. Here on... Yeah, let me just make one more point. It says here on A320, Dolby's best-known digital system is used to provide multi-channel surround sound in cinemas for 35-millimeter films, and in the home, from LaserDisc, DVDs, et cetera. And again, they call it EC3. So when we have a claim chart that says the patent reads on EC3, that is a claim chart for cinema. That's why when the district court said there's no claim charts for cinema, it was disregarding the evidence, and it was purely irrelevant. It certainly shouldn't be the basis for fees. Thank you. I'll save the rest of my time for Professor Fisher. Thank you, Your Honor. As this court stated in the Sensonics case, it is the judicial duty to refuse to condone behavior that exceeds reasonable litigation tactics. Lucent's conduct below did exceed reasonable litigation tactics. I'm going to turn to the cinema piece of the case, where it's our position that the district court did not abuse its discretion in awarding fees to cinema. And then I'm going to turn to the balance of the case, the bulk of the case, which is their allegations with respect to the consumer technology, where we believe that the court failed to consider evidence in doing the required analysis and considering the entirety of the record, and that that ought to be remanded to the district court for further consideration as to whether or not there's a type of fees as to the entirety of the case. Let me start with cinema. The fact is that Lucent failed to do what this court indicated in the view engineering case and many other cases is required before they file a lawsuit and allege that it infringed. And that is, according to view engineering... Is Rule 11 an exceptional case in the 285 synonymous here? I think for this piece of the case it is, Your Honor, and the district court referred to under Section 285 rubric cases incorporated in Rule 11 standard with respect to having a reasonable belief that there's infringement. And I think view engineering and many other cases support that. But in view engineering, what the court said was that in bringing the claim of infringement, the patent holder, if challenged, must be prepared to demonstrate to both the court and the alleged infringer exactly why it believed before filing the claim that it had a reasonable chance of proving infringement, failure to do such ordinary results, because not to say a result in Rule 11 sanctions. When your marketing materials grouped the consumer and cinema applications together, it said they both had the AC-3 technology. Let me explain what AC-3 as a family is. It's the third generation of A stands for audio, C stands for coding. So it's the third generation of audio coding technology that Dolby has. And the marketing material that they relied on, in fact, the sole document that they referred the district court to, as pointed out in the district court's order, what Mr. DiMera cited at page 5093-94 of the record, very clearly states that cinema was rolled out at a different time period, the 1991 time period, and that the consumer technology was rolled out later, in the 1995 time period. And that, according to page 5093 of the record, where we state in the marketing document that, quote, Dolby Digital is unusually versatile, not a single rigid scheme. It is a flexible process, allowing parameters such as bit rate, number of channels to be tailored to particular applications. That's at 5093 of the record. At the following page in the one marketing material they cited in the district court, it goes on to state at the bottom of 5094 that Dolby Digital in the cinema has provided a springboard for consumer formats, starting with laser discs, and then it goes on to say in 1995 came consumer technology, and that film sound has been the starting point for Dolby Digital. And it goes on to discuss consumer technology. So our marketing materials, and again, this is the sole document they presented to the district court to support their claim that they did any sort of investigation, very clearly differentiates the technology developed at different periods of time, and also very clearly states it's a flexible process to be tailored to particular applications. So the bottom line here, however, is that there is no evidence presented in the record of any pre-filing investigation with respect to cinema technology. And just to go back into the history of this case, they started harassing or making infringement assertions, we would say harassing our customers back in 1998 as to consumer technology, what was used on DVDs. In connection with those efforts, they approached the largest movie studios in the world, including Walt Disney and many others, and although they were very aggressive in the district court's own finding in their infringement accusations, not once in those accusations did they ever mention the term cinema, never comes up. And also important, cinema was prior art to the 938 patent, and it came up in some of these infringement accusations. None of our customers raised it as potential and validated prior art. And the assertion attorney, Mr. Rosenblatt, testifying to this deposition, I don't know, I don't know anything about cinema. So for them now to contend that they did some sort of pre-filing investigation is erroneous, and now they're saying you didn't provide them with discovery. It's not for us in discovery to educate them. They needed to have a basis before they asserted it in the first place. And very important in this case, we were eager to meet with them before the lawsuit was filed. They canceled meetings repeatedly, refused to have us attend meetings, so not only did they do no affirmative investigation, they did a negative investigation, because we were more than happy to sit down and talk to them about whatever infringement concerns they had. At the time, it was only consumer, and they had raised cinema, and we were more than happy to tell them why they were wrong there as well. The other thing I want to discuss is that they represented both the district court and repeatedly in their papers here that our documents say that cinema and consumer use the, quote, same algorithm. I invite them to point to one instance where we say that. No building documents ever say the same algorithm. They say what we just looked at in the record of 93 and 50 and 93 and 94 that developed at different times, screen board, starting point. So there can clearly be no abuse of discretion under these circumstances. And then, Judge Rager, to get to your point about the refusal to withdraw, we wrote them two letters before we ultimately filed a summary judgment motion. Not only did they fail to withdraw, and the letters were sent after the Vernon deposition where they admit in their papers they learned a different algorithm and no infringement. They didn't, not only didn't they pull down the flag, they didn't even bother to respond. We told them in the letters that if they didn't withdraw, we were going to see fees and sanctions. They didn't even bother to respond. They talk about Mark Davis, the name for Mark Davis' deposition. What's the effect of this allegation remaining in play on your marketplace over the months between the depositions and when they actually withdraw? Well, Your Honor, this entire litigation was, of course, very damaging to Dolby. Dolby actually rolled out a public offering during the midst of this litigation. I'm not certain what the exact timing was, whether it was during the intervening period, but it was certainly during the period where they were raising Cinema as a potential infringement target. And, of course, Cinema is Dolby's core, one of its core technologies. And this was very, very damaging. And I think the Mathis case and others talk about 285 is really the only way that a company like Dolby in these circumstances can get recompensed is through sanctions. You wanted to go on to your consumer. Yeah, but let me just very quickly on the Mark Davis issue. Total red herring. They chose not to take Mr. Davis' deposition, first of all. He was offered, and they didn't take it. Secondly, the magistrate had said that they couldn't have any additional discovery as to Cinema without getting affirmative relief from the magistrate. He had given limited discovery, and that was only Mr. Burns' deposition. So they didn't bother to go back to the magistrate. They couldn't have even asked Mr. Davis about Cinema because they didn't have leave of court. Finally, in their motion to compel, which is at pages 5154-57 on the record, the word Cinema never appears, and the reason why they didn't take Mr. Davis' deposition. It is a total red herring designed to somehow explain their failure to respond to letters and failure to pull down their flag when they admit that they knew there was no infringement from Mr. Burns' deposition. Let me now turn to the consumer side of the case. And this was the bulk of the case. Cinema was certainly not an insignificant part, but the bulk of the discovery, the bulk of the disputes, the bulk of the summary judgment briefing related to the accusations as to consumer technology. This court has been very clear, and the district court itself said, that it has to consider the totality of the circumstances. It has to consider, quote, the whole of the conduct below. And it's our position that the district court failed to do three things. It failed to consider that they asserted a knowingly invalid patent. It failed to consider the misconduct in the patent office that has directly impacted this lawsuit. And it failed to consider a misrepresentation of the district court in San Diego. Let me start with the issue of asserting a knowingly invalid patent. They, we initially filed this case in December of 2000, and it's a territory relief claim where we said the patent is not infringed and the patents are invalid. They ultimately didn't end up responding to our complaint until August of 2002. So there was an 18-month, at least, period of time there, more than 18-month period of time. At the time they filed their answer to the complaint, they denied that the patent was invalid. At the time they made that statement in their counterclaim, there was not only no reissue had been granted, but no reissue had even been filed. That was a false statement in their counterclaim from August of 2002. They nonetheless waited to file this reissue replication. We submit an effort to make this lawsuit as difficult and protracted for Dolby and for the court, I would submit, as possible. And they used the liberty to be reissued for two purposes. Number one, to continue to continually try to seek delay. And in this case, delay clearly favored this. There was no merit ever to their infringement accusations, and all we wanted was to clear the air. They wanted to delay things. So they continually came back to the district court to try and delay, using the reissue as a basis. Secondly, they attempted to turn back the clock to get around to- The patent did reissue, but not during the pendency of this lawsuit. And in fact, the court below, and in fact, Lucent urged the court. And in fact, in opposing the fees motion, told the court that the reissue, quote, is not part of this litigation. That's at page 4996 of the record. That was how they opposed our fees request. And they also told the court to ignore the reissue in dealing with some of our affirmative defenses. That's at page 514829. The district court notes that you don't assert inequitable conduct with respect to the patents that issue in this case. Well, Your Honor, let me address that. I think it's a very important point. We, as Lucent itself agrees, couldn't, due to the timing here, couldn't have asserted an equitable conduct. What we believe did occur is an equitable conduct as to the reissue. But because it was not a part of our case, we couldn't have. It was not right to raise that. What we are saying here is that the court must, in considering the totality of the circumstances, consider misconduct in the patent office, misconduct that was designed to impact this lawsuit in the ways I stated earlier about it seeking delay. And the reissue was based on a declaration that Lucent knew did not support the relief they were seeking. How do we know that? If you turn to the 938 patent, there are three names that appear on the front in addition to the PTO example. And one of the names is Mr. Johnston, the offender. Another name is Mr. Rosenblatt, the prosecuting attorney. And another name is Lucent Technologies, the S&E. Every single one of those individuals, either in a statement under oath or in Lucent's case to the European Patent Office or Head of Duty in Canada, stated very clearly that the 938 patent could not relate back to the earlier priority date they were seeking to reissue. Mr. Johnston said it in his deposition. Mr. Rosenblatt said it in his deposition. And, again, Lucent said it to the European Patent Office. So this was clearly misconduct. They were trying to twist the declaration that didn't support the original claims. Mr. Johnston says in his declaration when he said that some type of delay with priority date, he was talking about new claims that didn't ultimately become part of the reissue. So this was clearly misconduct that was designed directly to impact the lawsuit. And it's our position that under this court's precedent, and the district court itself recommends it, it has to consider the whole of the conduct. And this was, as I said, a litigation tactic that directly impacted the case, even though we did not allege negligible conduct. Were the proceedings in this case stayed and they were reissued? They were not. They, as I mentioned, sought to stay in the case many times and using the reissue as a basis for that. We, in discussions with them, said we'll agree to stay the case if you stop threatening or harassing our customers. And they refused. So based on that, we opposed the motion to stay. The district court, certainly within its discretion, declined to stay the case. And we went forward. And we went forward with the only patent in the case being this 938 patent, which they themselves conceived as a priority date of 1992 or later. So there was never any priority date earlier than that as to the 938 patent issue in that case. So the reissued proceedings did not have the effect of delaying the proceedings? Well, the way that they wanted it to certainly delay the proceedings. And they certainly continue to raise it. But you're correct. The district court declined to stay the case. We nonetheless had a brief continual stay request. And it came up over and over again. I know I wanted to reserve some time for rebuttal as well. Thank you, Mr. Fisher. Mr. Harris. You have more than three and a half minutes. Thank you, Your Honor. Let me just briefly address the first point that counsel made about the documents and to picking up on Your Honor's point about the central claim charts. There can't be any dispute at this point that the AC-3 claim charts were sufficient for Rule 11 purposes. If you look at Dolby's, and this isn't just marketing literature. It's marketing literature, it's technical literature, and it's admissions on their website. At A-5093, they say clearly that all variations of AC-3 use, in the words of Dolby, the same advanced perceptual coding technique. I mean, I don't know how more clear they have to be. That's at A-5093. But those are technical documents. Those are marketing documents. That particular one is a document describing Dolby Digital and what its evolution was. And then if you look, and I'm going to— I realize that's not directly to a technical audience to provide specifications. It's certainly not to the level of providing details about an algorithm. If you take a look at A-1964, you will see one of Dolby's patents, which I think by anyone's definition would be a technical document. It's at A-1964, column 2, line 18. The basic elements of the Dolby AC-3 perceptual coding scheme are set forth, and it cites a patent number. Details of the particular implementation of Dolby AC-3 are set forth in the standard. It refers to the standard there. And then it talks about, at line 24, the Dolby digital system typically provides the channel discreteness of 70-millimeter magnetic soundtrack films, which preserve the low-cost compatibility of 35-millimeter optical soundtrack films. How Dolby can stand here and say that they did not state publicly that Dolby Cinema was AC-3, according to the standard, is beyond me. And that's why the district court granted our motion to compel. The district court relied on this patent, relied on the other documents, and expressly said, OK, Lucent has made a case that the cinema is relevant. Take your discovery. That, in and of itself, defeats Rule 11. That discovery had to be reasonable or reasonably calculated to lead to discovery. It's not. The Rule 11 standard is objectively baseless. These documents clearly link cinema with AC-3. We were clearly entitled to go forward with a claim chart that said AC-3 infringers. Whether we're ultimately wrong or not, discovery revealed that AC-3 had subsidiary algorithms, but that's nowhere in the public record. Discovery revealed that. Rule 11 puts us back at the beginning. It's not a Rule 11 violation to rely on their own patent that says AC-3 is cinema. To get to their cross-appeal for broader fees, the reissue, we, from the very beginning of this, they sued us, remember, on a declaratory judgment. And we answered and counterclaimed. And within days, filed a reissue application. And we told them from the very beginning, let's not spend money on the case, let's have the patent office deal with the reissue, because their only real attack on that patent at the time was validity challenges. And we said to them, let's not spend any money. Let's make this easy. Let's wait for the patent office. They refused. We asked the district court, why don't we stay the case so nobody has any fees incurred. Let's see what the patent office does. Ultimately, all these inequitable conduct allegations are not substantiated. The patent came out of reissue. It gave us the right priority date. None of the art they cited on is prior art. And, by the way, we tried the inequitable conduct case, subsequently against another party in San Diego, and we won the inequitable conduct. All these same allegations. There's no merit to it. That's why they didn't raise inequitable conduct to the district court here, because the district court wasn't before the district court until it was fees on inequitable conduct when they didn't even plead it is way beyond the strictures of what this court requires for a fees application. Thank you, Mr. Kumaris. Thank you. Mr. Fisher? Yeah. You may have a minute and a half left. Thank you. Let me first talk about the issue of the client charts. As the senator, there's no dispute that they never are divided. You're cross with me at this point. Oh, okay. Very well. Let me talk about the misconduct. First of all, whatever happened in the different jurisdictions, San Diego, Mr. Kumaris trying it is not on the record. I don't know what was raised in that case, and I think it's inappropriate for me to raise that here. The fact is that Lucent was aware that the inventor, Lucent itself, and the prosecuting attorney believed that the issue upon which they were basing, turning back the clock on the priority date on the original claims, all testified, again, either under oath or with the duty of candidate of the European Patent Office, that there was no relation back to the 1990 or the 8th priority date. And the district court expressly refused to consider what happened in the patent office. Again, that was misconduct. It was designed to impact this lawsuit. It did impact the lawsuit. And it's our position that in considering the totality of the circumstances, as is required, as this court and the district court itself said, the district court should have considered this litigation tactic in connection with its fees request. And it also didn't consider the misrepresentation of the other court in San Diego concerning the reissue application as well. Let me just address one point quick. This is very factual law. Why would this court tinker with the findings of a judge who sat through it all and certainly has a better grasp of the nuances? I think that's a very important question, and let me respond to it. First of all, as to Sinema, I agree with you that this court should not tinker with the visa discretion standard in the court, considering all the evidence in front of it reached the right result there, that there was no adequate pre-filing investigation and that we were entitled to fees. As to consumer technology, what this court has said is that it has a role in ensuring that the district court below does, in fact, consider the tactics of counsel, does, in fact, consider all the evidence. And this court has been clear it, in the first instance, isn't going to get into the merits of the details, but it is going to ensure that district courts are doing that. And this is a textbook case for why a fee should be granted as the entirety of the case. And this court does have a role in remanding that to the district court so that it can do what this court has said is required, which is consider all of the misconduct that occurred below at enormous, enormous expense and difficulty to my client. Thank you. Thank you. All rise.